UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER D. RANALLI,

                Plaintiff,          Civil Action No. 15-14039
                                 Honorable Marianne O. Battani
                                 Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [17, 20]**

Plaintiff Christopher Ranalli ("Ranalli") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [17, 20], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Ranalli is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [20] be GRANTED, Ranalli's Motion for Summary Judgment [17] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.      REPORT

### A.      Procedural History

On March 30, 2010, Ranalli filed applications for DIB and SSI, alleging a disability onset date of February 4, 2010.  (Tr. 316-21).  These applications were denied initially on August 2, 2010.  (Tr. 196-203).  Ranalli filed a timely request for an administrative hearing, which was held on May 17, 2011, before ALJ Oksana Xenos.  (Tr. 112-32).  On September 2, 2011, ALJ Xenos issued a written decision denying those applications.  (Tr. 154-64).  On December 21, 2012, the Appeals Council issued an order remanding the case to the ALJ with instructions.  (Tr. 169-71).  After a second hearing, held on October 16, 2013 (Tr. 86-111), ALJ Xenos issued a second written decision, on November 8, 2013, again denying Ranalli's applications for DIB and SSI (Tr. 176-84).

On April 9, 2014, the Appeals Council remanded the case for a second time, this time specifying that it be assigned to a different ALJ.  (Tr. 190-92).  Thus, a third administrative hearing was held on July 31, 2014, before ALJ Anthony Smereka.  (Tr. 35-85).  Ranalli, who was represented by non-attorney representative Dannelly Smith, testified at that hearing, as did vocational expert Amelia Shelton.  (*Id.*).  On August 22, 2014, ALJ Smereka issued a written decision finding that Ranalli is not disabled.  (Tr. 15-28).  On September 14, 2015, the Appeals Council denied review.  (Tr. 1-5).  Ranalli timely filed for judicial review of the final decision on November 17, 2015.  (Doc. #1).

### B.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

2

> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.

> Step Three: If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis

reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the

[defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C. Background

### 1. Ranalli's Reports and Testimony

At the time of the July 2014 administrative hearing, Ranalli was 33 years old, and at 5'8"

tall, weighed 220 pounds. (Tr. 39, 370). He had lived with his father until the time of his

father's death, in December 2013, and then lived with his younger brother. (Tr. 50, 66). He completed high school but had no further education. (Tr. 39, 371). Previously, he worked as a direct care worker in the healthcare field, as a cutter/printer, and as a security guard. (Tr. 39-44).

Ranalli alleges disability as a result of cancer in his leg and bipolar disorder. (Tr. 58, 370). He injured his knee at work on February 4, 2010; x-rays were negative, but a subsequent MRI revealed a "possible sarcoma" in his right femur. (Tr. 448, 451, 463). He underwent two surgeries to remove a giant cell tumor in his right femur, the first in March of 2010 and the second in January of 2011. (Tr. 477-79, 602-04). He testified that he has used a cane since 2010: with the cane, he can walk "[l]ess than a block," but without it, he can walk only ten or twelve feet. (Tr. 53). Ranalli also testified that he cannot lift more than 5-10 pounds and can sit for only 20-30 minutes before he needs to elevate his legs. (Tr. 53-54). He testified that he is in pain every day; at the time of the July 2014 hearing, however, Ranalli had not seen a specialist for his knee problems in over a year. (Tr. 54, 62). He is able to perform some household chores, such as laundry and preparing simple meals. (Tr. 65). He uses the computer and enjoys drawing. (Tr. 65, 385). He does not drive because he lost his license in 2007. (Tr. 54).

Ranalli also testified that, once or twice a week, he becomes "manic" – he attempts to do more than he is able, which causes increased pain and frustration, and then renders him depressed and unable or unwilling to get out of bed for several days. (Tr. 58-59). He began receiving mental health treatment after contemplating suicide and has difficulty controlling his anger, particularly when he is in a manic state. (Tr. 59-60).

2.   *Medical Evidence*

a.   *Physical Impairments*

Ranalli fell and injured his right knee on February 4, 2010. (Tr. 451). An MRI

performed on February 18, 2010, revealed a pre-existing tumor in that knee.  (Tr. 448, 472).  A March 2, 2010 x-ray report indicated a "destructive process in the femur," and neoplastic disease was thought to be the most likely basis.  (Tr. 467).

On March 22, 2010, Ranalli underwent a surgical procedure – extended intralesional curettage with cementation of the right distal femoral bone lesion – to remove a giant cell tumor, which was performed by Ronald Irwin, M.D.  (Tr. 477).  At a follow-up visit to Dr. Irwin on March 25, 2010, Ranalli was permitted to be full weightbearing with crutches and advised to work on strengthening his quadriceps and hamstring at home.  (Tr. 490).  At his next visit to Dr. Irwin, in April 2010, Ranalli had full range of motion but still lacked strength on extension and was referred to physical therapy.  (Tr. 586).  In June of 2010, Dr. Irwin did not detect any signs of local recurrence in the right knee, but Ranalli complained of occasional pain in the left knee; Dr. Irwin indicated that an x-ray and MRI would be ordered once he obtained insurance.  (Tr. 587).  On July 1, 2010, Ranalli reported vague pain in the right knee, but he had only minimal effusion, and x-rays showed excellent alignment of the cementation with the pins, without signs of recurrence.  (*Id.*).

On August 9, 2010, Ranalli presented to his primary care physician, Mark Wein, D.O., with complaints of constant pain in his right knee, and he was advised to follow up with Dr. Irwin.  (Tr. 852).  At subsequent visits to Dr. Wein during the fall of 2010, Ranalli continued to complain of knee pain, and different pain medications were prescribed.  (Tr. 848-51).

On January 4, 2011, Ranalli returned to see Dr. Irwin after an x-ray and CT scans from December of 2010 showed local recurrence of the giant cell tumor in his right knee.  (Tr. 590).  Ranalli underwent a second surgery on January 7, 2011, to remove the recurrent tumor and to resect "previous cementation and K-wires."  (Tr. 602).  Post-operative x-rays looked good on

5

January 20, 2011, and Ranalli was advised to work on range of motion and strengthening.  (Tr. 856).  On February 17, 2011, Ranalli returned to see Dr. Irwin, who noted that he needed to work harder on extension.  (Tr. 855).  At his next visit, on March 31, 2011, Dr. Irwin noted that Ranalli "walks with a cane but he can be full weightbearing."  (*Id.*).

On May 20, 2011, Ranalli underwent a consultative physical examination with Jack Salomon, M.D.  (Tr. 654-63).  Ranalli reported that his recent health had been "noticeably good," but he had gained some weight and had pain in his knees and difficulty walking.  (Tr. 654).  Ranalli used a cane to walk, was unable to squat, and had difficulty walking on his heels and his toes.  (Tr. 655).  Dr. Salomon completed a Medical Source Statement opining that Ranalli could sit for only 5-10 minutes, stand for only 5 minutes, and walk less than a block "at one time without interruption"; and sit for no more than 2 hours, stand for no more than 2 hours, and walk for less than one hour "total in an 8 hour work day."  (Tr. 659).

Ranalli then returned to see Dr. Irwin for the last time on June 28, 2011; at that time, he had good range of motion with mild patellofemoral crepitation, so physical therapy was ordered to aid in strengthening his quadriceps.  (Tr. 854).  After this visit to Dr. Irwin, Ranalli did not seek any further medical treatment until he returned to see Dr. Wein in January of 2013 for a routine physical examination and with complaints of heartburn.  (Tr. 843-45).  Follow-up visits in March and April of 2013 were unremarkable.  (Tr. 839-42).  When Ranalli returned to Dr. Wein in August of 2013, he reported pain in his left knee that was, at times, worse than his right knee pain, which made him concerned that he might have a tumor in his left knee.  (Tr. 837-38).  X-rays showed only arthritic changes, however, so he was prescribed Ultram and support stockings in addition to Mobic.  (*Id.*).  At his next visit, in September of 2013, Ranalli reported no improvement, so Dr. Wein advised him to use his cane regularly to take pressure off of the

6

knee, indicating that Neurontin would be considered if the issue worsened.  (Tr. 835-36).  At a return visit in December of 2013, Ranalli reported that he was "doing well" and had no complaints other than chronic knee and leg pain from his history of surgery and arthritis.  (Tr. 980-81).  In March of 2014, Dr. Wein performed a routine physical, noting that Ranalli's symptoms included only occasional muscle aches.  (Tr. 977-79).  He last saw Dr. Wein in June of 2014, reporting an increase in right leg pain; Dr. Wein prescribed Norco and referred Ranalli to an oncologist to make sure there was no recurrence of his tumor.  (Tr. 972-73).

b.     *Mental Impairments*

In addition to physical impairments, Ranalli also has been diagnosed with bipolar disorder.  On June 25, 2010, Ranalli presented to the emergency room with suicidal and homicidal ideations.  (Tr. 499).  He reported difficulty sleeping and feeling "overwhelmed," and said that he "contemplated climbing an electric tower and jumping off" on the way to the hospital.  (*Id.*).  During a psychiatric evaluation on June 26, 2010, Ranalli reported that he goes through a "rollercoaster of mood swings" – ranging from times when he is extremely "low" and withdrawn, to times that he becomes extremely energetic.  (Tr. 506).  Ranalli was diagnosed with bipolar disorder and started on medication.  (Tr. 506-07).

After his discharge, on June 28, 2010, Ranalli began outpatient psychiatric treatment at The Guidance Clinic.  (Tr. 509, 530, 612-52).  A progress note dated August 23, 2010 indicates that Ranalli was unable to sleep at times and reported outbursts when he is under stress.  (Tr. 635).  He further reported that, since starting Depakote, his mood swings had lessened.  (*Id.*).

On October 12, 2010, Ranalli was brought to the emergency room after he became "aggressive," "assaultive," and "completely out of control."  (Tr. 535).  He reported having "increasing frequency of violent outbursts including physical altercation with [his] fiancée."

7

(*Id.*).  He was discharged in stable condition, with a diagnosis of intermittent explosive disorder, and his medications included Depakote, Seroquel, and Klonopin.  (Tr. 547-48).

On June 17, 2011, Ranalli underwent a consultative psychological examination with Hugh Bray, Ph.D.  (Tr. 665-73).  On examination, Ranalli was cooperative and verbally responsive, with good eye contact and adequate insight and judgment.  (Tr. 667).  Dr. Bray provided diagnoses of mood disorder, adjustment disorder with anxiety and depressed mood, and a history of intermittent explosive disorder.  (Tr. 669).  With respect to work-related mental activities, Dr. Bray opined that Ranalli was mildly impaired in the ability to relate to others and understand, remember, and carry out tasks, and moderately impaired in the ability to maintain attention, concentration, persistence, and pace, and withstand the stress and pressure of day-to-day work activities.  (*Id.*).

At some point, Ranalli transitioned his mental health care to Team Mental Health Services.  At his initial psychiatric evaluation on January 25, 2012, Ranalli reported that he was having "rapid mood swings, insomnia, racing thoughts, sadness" and a "history of manic episodes and depressive episodes."  (Tr. 738).  Treating psychiatrist Dr. Chapman noted that Ranalli had good grooming, euthymic mood, normal speech, intact judgment, fair insight, and logical and coherent thought process.  (Tr. 738-39).  At subsequent visits, Ranalli reported that he was "back on medication therapy and [] feeling like himself again" in February of 2012; "his mood is better with the medications" in March of 2012; that he had "no anxiety complaints, no mood complaints, no sleep problems, no depressed mood and no manic symptoms" in June of 2012; and that his "mental/emotional status has been better because of consistent treatment" in February of 2013.  (Tr. 699, 702, 769, 792).  In a March 2013 psychosocial assessment, Ranalli indicated that he needed no help with his activities of daily living; volunteered at a neighborhood

8

flea market some weekends; wanted to go back to school for computer repair; worked well with people; and specifically said, "I feel better than I have in a long while." (Tr. 831-32).

Dr. Bens Sandaire completed a Mental RFC Questionnaire on October 5, 2013, noting that Ranalli had been treated at Team Mental Health Services by a team of care coordinator, therapist, nurse, and psychiatrist. (Tr. 800-03). On that form, Dr. Sandaire indicated that Ranalli's bipolar disorder is "to a point where he will start [a] project [or] task and will not be able to finish them which in turn leads to depression and manic moods." (Tr. 800). He further indicated that Ranalli's prognosis is "moderate" and that although he can "manage to some degree with medication," he will always require treatment of some kind. (*Id.*). Dr. Sandaire further opined that Ranalli is "seriously limited" in the ability to remember work-like procedures; is "unable to meet competitive standards" when it comes to his ability to complete a normal workday or work week without interruptions from psychological symptoms; and has "no useful ability to function" when it comes to performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 802). In addition, Dr. Sandaire opined that Ranalli's impairments would likely cause him to be absent from work four or more days per month. (Tr. 803).

On July 12, 2014, Ranalli underwent a second consultative psychological examination, this time with Julia Czarnecki, MA, LLP, and Nick Boneff, Ph.D. (Tr. 864-67). Dr. Boneff diagnosed Ranalli with "[a]djustment disorder with anxiety and depressed mood, managed with medication." (Tr. 867). Dr. Boneff and Ms. Czarnecki further indicated that Ranalli was "not evidencing any symptoms of major depression, mood disorder, disturbance of thought, or impaired short-term working memory or concentration that would affect his ability to follow 2 or 3 step directions or appropriately interact with others." (*Id.*). It was further indicated that

9

Ranalli's history of anger issues was managed through medication and that he experienced only mild distractions due to pain.  (Tr. 868, 873).

### 3.    Vocational Expert's Testimony

Amelia Shelton testified as an independent vocational expert ("VE") at the administrative hearing.  (Tr. 72-80).  The ALJ asked the VE to imagine a claimant of Ranalli's age, education, and work experience who can perform light work, with the following additional limitations:  can stand or walk for no more than two out of eight hours; must have a sit/stand option that allows him to perform work in either a sitting or standing position, and allows for a change in position approximately every 30 minutes; should not work around hazards, including work at unprotected heights or around dangerous machinery; no climbing of ladders, ropes, or scaffolds; no crawling; only occasional balancing, stooping, kneeling, crouching, and climbing ramps or stairs; no driving in the course of employment; no use of foot controls or pedals with either lower extremity; and limited to unskilled work.  (Tr. 77).  The VE testified that the hypothetical individual would be capable of working in the jobs of marker (86,400 jobs nationally), parking lot attendant (41,000 jobs), and inspector/hand packer (113,000 jobs).  (Tr. 77-79).

### D.    The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Ranalli has not engaged in substantial gainful activity since February 4, 2010 (the alleged onset date).  (Tr. 17).  At Step Two, the ALJ found that Ranalli has the severe impairments of status-post removal and treatment of two giant cell tumors of the right femur, arthritis, bipolar disorder, and obesity.  (Id.).  At Step Three, he found that Ranalli's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 18).

The ALJ then found that Ranalli retains the residual functional capacity ("RFC") to

10

perform light work, with the following additional limitations:  can stand or walk for no more than two out of eight hours; must have a sit/stand option that allows him to perform work in either a sitting or standing position, and allows for a change in position approximately every 30 minutes; should not work around hazards, including work at unprotected heights or around dangerous machinery; no climbing of ladders, ropes, or scaffolds; no crawling; only occasional balancing, stooping, kneeling, crouching, and climbing ramps or stairs; no driving in the course of employment; no use of foot controls or pedals with either lower extremity; and limited to unskilled work.  (Tr. 20).

At Step Four, the ALJ determined that Ranalli is unable to perform his past relevant work.  (Tr. 26).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Ranalli is capable of performing a significant number of jobs that exist in the national economy. (Tr. 27).  As a result, the ALJ found that Ranalli is not disabled under the Act.  (Tr. 28).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a

11

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

F.     **Analysis**

1.     *The ALJ Properly Weighed the Medical Opinion Evidence*

a.     *Dr. Sandaire*

Ranalli first argues that the ALJ failed to properly weigh the medical opinion evidence from Dr. Bens Sandaire, his treating psychiatrist, and to give good reasons for discounting Dr. Sandaire's opinion that his bipolar disorder was disabling. (Doc. #17 at 11-15).

Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. §404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).

As set forth above, in a Mental RFC Questionnaire dated October 5, 2013, Dr. Sandaire indicated that Ranalli's bipolar disorder is "to a point where he will start [a] project [or] task and

will not be able to finish them which in turn leads to depression and manic moods." (Tr. 800). In addition, Dr. Sandaire opined that Ranalli is "seriously limited" in the ability to remember work-like procedures; is "unable to meet competitive standards" when it comes to the ability to complete a normal workday or work week without interruptions from psychological symptoms; and has "no useful ability to function" when it comes to performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 802). Dr. Sandaire also opined that Ranalli's impairments would likely cause him to be absent from work four or more days per month. (Tr. 803).

Contrary to Ranalli's assertions, the ALJ specifically considered Dr. Sandaire's opinion, giving it less weight than the opinions of Dr. Bray and Dr. Boneff because he found those opinions "more consistent with the evidence of record as a whole." (Tr. 25). In reaching this conclusion, the ALJ provided a lengthy discussion of Ranalli's mental health treatment, which showed that his bipolar disorder was consistently managed with medication. (Tr. 22-24). For example, the ALJ discussed Team Mental Health Services records from January 2012 through February 2013, in which Ranalli's bipolar disorder was characterized as only moderate in severity, and it was noted that his symptoms improved with Depakote. (Tr. 22, 24, 699, 738-39, 769). Indeed, as the ALJ noted, at Ranalli's initial psychiatric evaluation on January 25, 2012, Dr. Chapman noted that Ranalli had good grooming, euthymic mood, normal speech, intact judgment, fair insight, and logical and coherent thought process, without any evidence of psychosis. (Tr. 22, 738-39).

Having discussed the relevant mental health records, the ALJ then noted that Dr. Boneff diagnosed Ranalli with "[a]djustment disorder with anxiety and depressed mood, managed with medication." (Tr. 23, 867). Dr. Boneff and Ms. Czarnecki further opined that Ranalli was "not

evidencing any symptoms of major depression, mood disorder, disturbance of thought, or impaired short-term working memory or concentration that would affect his ability to follow 2 or 3 step directions or appropriately interact with others." (*Id.*). The ALJ gave significant weight to this opinion, finding it generally consistent with the record evidence, which demonstrated that Ranalli's mental health had been "managed appropriately with Depakote." (Tr. 24-25).

Additionally, in discounting the opinion of Dr. Sandaire, the ALJ gave significant weight to Dr. Bray's opinion that Ranalli was mildly impaired in the ability to relate to others and understand, remember, and carry out tasks, and moderately impaired in the ability to maintain attention, concentration, persistence, and pace, and withstand the stress and pressure of day-to-day work activities. (Tr. 25, 669). Specifically, the ALJ found these opinions consistent with Dr. Bray's own examination, as well as the record as a whole, and found that they supported a conclusion that Ranalli's mental impairments "cause no more than moderate functional limitations." (Tr. 25).

Thus, Ranalli's assertion that "the ALJ gave <u>no</u> explanation for essentially rejecting Dr. Sandaire's Mental RFC" (Doc. #17 at 13 (emphasis in original)) is without merit: the ALJ considered opinions from both medical and non-medical sources, and comprehensively discussed Ranalli's mental health treatment and response to medication, in declining to give controlling weight to Dr. Sandaire's opinion. (Tr. 20-26). This was sufficient. *See, e.g., Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175-76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion.").[1]

---

[1] To the extent Ranalli is arguing that the ALJ erred in failing to more particularly examine the factors set forth in 20 C.F.R. §404.1527(c) (Doc. #17 at 15; Doc. #22 at 2), such an argument fails. The law is clear that an ALJ is not obligated to explicitly discuss each of the factors listed

Ranalli also argues that the ALJ impermissibly "played doctor" by rejecting Dr. Sandaire's medical opinion that his impairments would cause him to miss work more than once a month without relying on another medical opinion to the contrary.   (Doc. #17 at 14). Specifically Ranalli points out that, although the ALJ gave the opinions of Dr. Bray and Dr. Boneff more weight than that of Dr. Sandaire, neither of these doctors specifically opined that he would not miss work more than once a month, and, therefore, the ALJ's decision lacked the requisite "logical bridge" from the medical evidence to the conclusion.   (*Id.*).   This argument is not persuasive.   Once the ALJ properly determined that the consulting physicians' opinions were entitled to greater weight than Dr. Sandaire's opinion, the ALJ was permitted to adopt the restrictions contained in the former, even if they did not correspond, point-by-point, to every single opinion offered by the treating physician.   To that end, the Sixth Circuit has explained: "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."   *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).   Here, that is exactly what the ALJ did:   he considered Ranalli's statements, the objective medical evidence, and the medical and non-medical opinions of record to develop an RFC that included the mental limitations he found appropriate.   (Tr. 20-26).   This was not reversible error.

b.   *Dr. Salomon*

Ranalli also argues that the ALJ erred in giving "less than significant weight" to the opinion of the consultative physical examiner, Dr. Salomon.   (Doc. #17 at 16-17).   As set forth

---

in this section, and here, the ALJ's reasoning was thorough and sound.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons … for the weight … give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis.").

above, Dr. Salomon completed a Medical Source Statement on May 20, 2011, in which he opined that Ranalli could sit for only 5-10 minutes, stand for only 5 minutes, and walk less than a block "at one time without interruption"; and sit for no more than 2 hours, stand for no more than 2 hours, and walk for less than one hour "total in an 8 hour work day." (Tr. 659). Ranalli argues that this RFC "essentially means that [he] would be <u>unable</u> to complete an 8-hour workday because he could sit/stand/walk for a total of no more than 5 hours in an 8-hour day." (Doc. #17 at 16 (emphasis in original)). To begin with, this is simply not accurate: as the ALJ explicitly recognized, "Because the total time for sitting, standing, and walking does not equal or exceed 8 hours, Dr. Salomon indicated that [Ranalli] would be getting up and down for the rest of the 8 hours." (Tr. 25, 659).[2]

Moreover, in assigning Dr. Salomon's opinion "less than significant weight," the ALJ specifically stated:  "I find that several of Dr. Salomon's assessed limitations lack adequate support and are inconsistent with some of his own objective examination findings …." (Tr. 26). Ranalli now argues that "it's unclear which examination findings the ALJ felt were 'inconsistent.'" (Doc. #17 at 16).  However, a review of the ALJ's decision reflects that there was a specific discussion of Dr. Salomon's examination findings, including identification of certain inconsistencies.  (Tr. 26).  For example, the ALJ recognized that Dr. Salomon identified abnormalities, including an inability to squat, difficulty walking on heels and toes, a fine tremor of the hands, and relative weakness of the right knee.  (Tr. 26, 655).  However, the ALJ explained that Dr. Salomon also noted that Ranalli had no atrophy of the muscles, a good grip, was able to walk heel to toe, and was able to use his hands to perform fine and gross

---

[2] When asked, "If the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is [Ranalli] performing for the rest of the 8 hours," Dr. Salomon answered: "Gets up and down." (Tr. 659). Thus, it is clear that Dr. Solomon did not believe the restrictions he imposed would preclude Ranalli from working an 8-hour day.

manipulations.  (Tr. 26, 655).  Thus, contrary to Ranalli's assertions, the ALJ clearly identified inconsistencies within Dr. Salomon's examination, and those inconsistences are borne out by the evidence of record.

Moreover, the ALJ provided additional reasons for discounting Dr. Salomon's opinion. (Tr. 18, 26).  For example, the ALJ noted that Dr. Salomon's findings that Ranalli was unable to travel without a companion for assistance and unable to use standard public transportation were inconsistent with: (1) Ranalli's own report that it was financial difficulties – rather than any medical condition – that prevented him from using public transportation; and (2) his repeated statements that he was independent in his activities of daily living.  (Tr. 18, 382-84, 543, 667, 734, 764, 865, 936).  The ALJ also noted that Dr. Salomon's Medical Source Statement lacked adequate support because he did not complete the section that specifically asked for identification of the particular medical or clinical findings that supported his assessment and limitations.  (Tr. 26, 658).  This was an appropriate consideration in determining the amount of weight to give Dr. Salomon's opinion.  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation).[3]

For all of these reasons, the Court finds that substantial evidence supports the ALJ's assignment of weight to the relevant medical opinions.

---

[3] Ranalli also argues, as he did with respect to Dr. Sandaire's opinion, that the ALJ impermissibly "played doctor" by failing to rely on any other medical opinion in rejecting Dr. Salomon's opinion as to his RFC.  (Doc. #17 at 16-17).  Again, this argument fails where the ALJ considered all of the evidence presented – including Ranalli's statements, the objective medical evidence, and the medical opinions of record – to develop a physical RFC that included the limitations he believed appropriate.  (Tr. 20-26).  *See Coldiron*, 391 F. App'x at 439.

> 2. *The ALJ's RFC Assessment Adequately Reflects Ranalli's Moderate Limitations in Concentration, Persistence, or Pace*

With regard to concentration, persistence or pace ("CPP"), the ALJ found that Ranalli has moderate difficulties. (Tr. 18). In turn, in the RFC he ultimately adopted, the ALJ limited Ranalli to the performance of "unskilled work." (Tr. 20). Ranalli now argues that this limitation did not adequately account for his deficiencies in CPP. (Doc. #17 at 17-20). The Court disagrees.

Where an ALJ finds that a claimant has CPP deficiencies, failure to account for such deficiencies in the hypothetical question may constitute reversible error. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010). While an ALJ is not required to include any particular phrase or talismanic language in an RFC to properly account for a claimant's CPP limitations, the hypothetical limitations chosen by the ALJ must be supported by substantial evidence. *See Barnes v. Comm'r of Soc. Sec.*, 2013 WL 6328835, at *14 (E.D. Mich. Dec. 5, 2013) (citing *Smith v. Halter*, 307 F.3d 377, 378-79 (6th Cir. 2001)). However, as this Court has previously made clear, "[T]here is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011); *see also Schalk v. Comm'r of Soc. Sec.*, 2011 WL 4406824, at *11 (E.D. Mich. Aug. 30, 2011). And, recently, the Sixth Circuit confirmed that "[c]ase law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in [CPP]." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016).

In this case, substantial evidence supports the ALJ's decision to limit Ranalli to unskilled work, despite his assessment of "moderate" limitations in CPP at Steps Two and Three of the sequential evaluation.  As the ALJ noted, Ranalli indicated in a function report that he finishes what he starts, follows instructions, handles changes in routine well, and handles stress well most of the time.  (Tr. 18, 386-87).  The ALJ also noted medical records showing that Ranalli's memory and cognitive functions were intact and that he demonstrated adequate judgment and concentration.  (Tr. 18, 19, 491, 559-60).  Similarly, the ALJ noted that, at the June 2011 consultative examination, Dr. Bray found that Ranalli's insight and judgment were adequate and his concentration, attention, and persistence were appropriate.  (Tr. 19, 667-69).  Moreover, in an opinion given significant weight by the ALJ, Dr. Boneff endorsed the finding that Ranalli was "not evidencing any symptoms of major depression, mood disorder, disturbance of thought or impaired short-term working memory or concentration that would affect his ability to follow 2 or 3 step directions or appropriately interact with others."  (Tr. 23, 867).  For all of these reasons, Ranalli has not established that additional, more specific mental limitations were required in order to account for his moderate limitation in CPP.  *See, e.g., Padlo v. Comm'r of Soc. Sec.*, 2016 WL 4536425, at *3 (E.D. Mich. Aug. 31, 2016) ("Plaintiff's argument rests on an assertion that the ALJ's independent findings about his CPP limitations must be expounded on in the RFC and hypothetical.  However, an ALJ is not required to include certain language when describing a limitation ….").

### 3.      The ALJ Adequately Considered Ranalli's Obesity

Ranalli next argues that the ALJ did not properly consider his obesity in combination with his other impairments, as required by Social Security Ruling ("SSR") 02-1p.  (Doc. #17 at 20-22).  This Ruling provides guidance for evaluating the impact of obesity on other physical

and mental conditions. *See Soc. Sec. Rul. 02-1p*, 2000 WL 628049 (Sept. 12, 2002). It recognizes obesity as "a risk factor" that increases an individual's chances of developing impairments and notes that obesity often complicates chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. *Id.* at *3. However, SSR 02-1p does not mandate a particular mode of analysis for an obese claimant. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006). Rather, this Court has held that compliance with SSR 02-1p only requires demonstration that the ALJ "considered" obesity. *See Dorrough v. Comm'r of Soc. Sec.*, 2012 WL 4513624, at *9 (E.D. Mich. Aug. 10, 2012). Indeed, the ALJ's "findings need not contain an explicit reference to the claimant's obesity if the decision as a whole appears to have adopted limitations resulting from the condition." *Id.* (citing *Coldiron*, 391 F. App'x at 443 and *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

In this case, it is clear that the ALJ considered the effects of Ranalli's obesity. As an initial matter, the ALJ specifically found that Ranalli's obesity was a severe impairment. (Tr. 17). In addition, here, as in *Bledsoe*, the ALJ not only specifically recognized SSR 02-1p but also explicitly discussed treatment records with findings regarding obesity and weight gain. (Tr. 17, 21, 24, 655, 841). For example, the ALJ identified Ranalli as "clinically obese" with a BMI of 38.7 when he weighed 240 pounds at the consultative examination in May of 2011.[4] (Tr. 21, 655). Moreover, the ALJ limited Ranalli to light work with additional restrictions related to

---

[4] The Court recognizes that the ALJ did not specifically discuss the June 2014 BMI calculation referenced by Ranalli in his motion. (Doc. #17 at 21). At the office visit cited by Ranalli, he was 5'8.25" tall and weighed 281 pounds, giving him a BMI of 42.4 and rendering him "extremely" obese. (*Id.* (citing Tr. 972)). However, the ALJ clearly considered this record – albeit without an explicit calculation of BMI – by referencing it as part of a discussion of Ranalli's right leg pain. (Tr. 22, 972). Regardless, where the ALJ had already found Ranalli to be obese when he weighed even less, the Court finds no error warranting remand in the ALJ's failure to explicitly discuss his weight at the particular visit referenced by Ranalli. *See, e.g., Kornecky*, 167 F. App'x 496, 508 (an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").

standing, walking, postural activities, commercial driving, and the use of foot controls.  (Tr. 20).

Ranalli has not even asserted – let alone pointed to specific evidence demonstrating – that his

obesity increased the severity of his other impairments or affected his functioning to a greater

extent than reflected in the ALJ's RFC finding.  For these reasons, Ranalli simply has not shown

that the ALJ erred in considering the functional effects of his obesity.  *See, e.g., Essary v.

Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) (finding that the ALJ took Essary's

obesity into account and the "absence of further elaboration on the issue of obesity likely stems

from the fact that Essary failed to present evidence of any functional limitations resulting

specifically from her obesity").

### 4.    *Substantial Evidence Supports the ALJ's Credibility Determination*

Lastly, Ranalli argues that the "ALJ's credibility finding is not supported by substantial

evidence."  (Doc. #17 at 22-24).  Specifically, Ranalli argues that the ALJ erred by (1)

discounting his subjective complaints solely because they were not supported by objective

medical evidence, and (2) mischaracterizing some of his activities in an effort to discredit him.

(*Id.*).  These arguments fail.

The Sixth Circuit has held that determinations of credibility related to subjective

complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of

the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health &

Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. &

Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not

be disturbed "absent compelling reason."  *Smith*, 307 F.3d at 379.  The ALJ is not simply

required to accept the testimony of a claimant if it conflicts with medical reports and other

evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).

Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could

reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul. 96-7*, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

As an initial matter, contrary to Ranalli's assertion, the ALJ did not discredit his testimony "solely because the objective medical evidence [did] not fully support [his subjective complaints." (Doc. #17 at 22). Rather, the ALJ explained that Ranalli's allegations of extreme physical limitations were both "out of proportion with the objective medical evidence of record and [] also inconsistent with the amount and type of treatment he sought since his second surgery in January 2011." (Tr. 24). These were all good reasons for the ALJ's credibility determination. Indeed, the ALJ recognized that, in March of 2011, Dr. Irwin noted that Ranalli walked with a cane but could be full weightbearing. (Tr. 24, 855). The ALJ also noted that after Ranalli's final follow-up with Dr. Irwin in June of 2011, he did not seek any medical treatment for more than eighteen months. (Tr. 24). And, the ALJ pointed out that, when Ranalli presented to Dr. Wein in August of 2013, Dr. Wein found no gross motor or sensory dysfunction and Ranalli's muscle strength was symmetrical in all extremities. (Tr. 24, 837). The ALJ further noted that, in March of 2014, Ranalli reported only occasional muscle aches, and Dr. Wein simply provided medication refills. (Tr. 24, 977-79). It was entirely proper for the ALJ to conclude that Ranalli's complaints of pain were disproportionate to the objective medical evidence. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the

claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.").[5]

Ranalli also cites three specific examples of ways in which the ALJ purportedly mischaracterized his daily activities in discounting his credibility. Specifically, Ranalli takes issue with the ALJ's finding that he was "helping take care of his father who was recovering from cancer at that time and he was also volunteering at a neighborhood flea market some weekends," as well as the ALJ's observation that he "went out for his girlfriend for karaoke" in July of 2013. (Doc. #17 at 23 (quoting Tr. 24)). According to Ranalli, the ALJ did not explain "exactly 'how' [he] was 'helping to take care of his father' or what [he] actually did (and for how long and how often) at the neighborhood flea market …," nor did he appropriately recognize the "untaxing" nature of karaoke. (*Id.*).

A review of the ALJ's decision, however, makes clear that he accurately and fairly characterized Ranalli's daily activities. For example, the ALJ clearly recognized that Ranalli's volunteering at the flea market was an occasional, rather than daily, activity, noting that he volunteered "some" weekends in "warm weather." (Tr. 24, 83, 942). Similarly, while the ALJ did not explicitly state that Ranalli's assistance to his father included only washing dishes, microwaving food, and doing laundry – often with the help of other family members – he did state that Ranalli was "helping take care of his father," which certainly implies that the ALJ

---

[5] The same is true regarding the ALJ's decision to discount Ranalli's credibility because his "testimony regarding the frequency of his manic episodes and severity of his depressive episodes is not supported by the objective medical evidence." (Tr. 23). As the ALJ noted, after Ranalli was prescribed Depakote in August 2010, he quickly reported fewer mood swings; he acknowledged in February 2013 that his mental state was much better with consistent treatment; and in July 2014, he indicated that Depakote helped stabilize his mood. (Tr. 24, 635, 769, 864). Again, then, in making his credibility determination, the ALJ did not err in evaluating the consistency of Ranalli's allegations and the other evidence of record. *See Kalmbach*, 409 F. App'x at 863.

understood that Ranalli was not his father's sole caretaker. (Tr. 24). Moreover, the ALJ did not necessarily find karaoke to be a taxing activity, as Ranalli suggests; rather, he merely mentioned this outing as one of Ranalli's many activities. (Tr. 23-24).

Finally, even if the ALJ did mischaracterize or overstate these three specific activities, he relied on numerous other social and/or physical activities in which Ranalli routinely engaged, including building computers, writing a book, doing yoga, making fishing lures, drawing, taking care of young children, preparing meals, and performing household chores. (Tr. 24, 616, 640, 667, 746, 764, 815). This alone constitutes substantial evidence in support of the ALJ's analysis of Ranalli's daily activities. Thus, the ALJ properly considered the inconsistencies between Ranalli's allegations of disability and his activities of daily living in evaluating his credibility. In sum, the ALJ provided a reasonable explanation, supported by substantial evidence, for discounting Ranalli's credibility. Accordingly, Ranalli has not shown a "compelling reason" to disturb the ALJ's credibility determination. *Smith*, 307 F.3d at 379.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [20] be GRANTED, Ranalli's Motion for Summary Judgment [17] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: November 7, 2016                       s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 7, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager